Charles GOLDSTEIN, Appellant,

v.

Megerdich DABANIAN and Emma K. Dabanian t/a East Tioga Check Service.

Louis SERNOVITZ, Herbert Sabulsky and Sidney Singer, Appellants,

v.

Irving HERTZ, t/a Terminal Check Service.

Nos. 13470, 13471.

United States Court of Appeals Third Circuit.

Argued May 1, 1961.

Decided June 2, 1961.

Rehearing Denied June 29, 1961.

———◆———

Stanley Bernard Singer, Philadelphia, Pa., for appellants.

Robert E. Nagle, Washington, D. C. (Charles Donahue, Solicitor, Bessie Margolin, Asst. Solicitor, U. S. Dept. of Labor, Washington, D. C., Ernest N. Votaw, Regional Atty., Chambersburg, Pa., on the brief), for Secretary of Labor, amicus curiae.

Oscar Spivack, Charles W. Woolever, Philadelphia, Pa. (Raymond L. Shapiro, Wexler, Mulder & Weisman, Philadelphia, Pa., on the brief), for appellees.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

GOODRICH, Circuit Judge.

These two appeals present the same question, namely, whether employees of the two defendants are engaged in interstate commerce or the production of goods for commerce under the Fair Labor Standards Act, 29 U.S.C.A. § 206(a). The plaintiffs sued to recover unpaid overtime compensation, liquidated damages and counsel fees.[1] The district court held that they were not engaged in commerce or the production of goods for commerce and dismissed the action. The decision is unreported.

It is agreed by all persons concerned that the question here is not determined by the nature of the business in which the employer is engaged but by the duties of the individual employees. Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753; Mitchell v. Household Finance Corporation, 3 Cir., 1953, 208 F.2d 667. These employees did three things for their respective employers. One, for a fee they cashed nonpersonal checks presented to them. These checks, usually but not always, are payroll checks.[2] Two, they issued money orders drawn on American Express or National Express. Three, they accepted payment, for a small fee, of utility company bills. Most of the customers were persons who did not have individual bank accounts of their own. The trial court decided that these plaintiffs were not engaged in commerce or the production of goods for commerce. He found it unnecessary to determine whether they qualified under exceptions to the rule for coverage described in the statute.

Contrary to the district court's determination we think that these employees fell within the general coverage of the act. What they did was to cash these checks and at the end of a business day total them up for deposit in the employer's bank account. While 91% of the checks were drawn on local banks in Pennsylvania, 9% of them were drawn on banks out of the state.

That the checks are "goods" within the meaning of the statute was decided by the Second Circuit in Bozant v. Bank

---

1. The Secretary of Labor submitted a brief to this Court as amicus curiae.

2. Some personal checks in amounts up to twenty dollars were also cashed for persons known by the particular employees.

of New York, 1946, 156 F.2d 787, applying Western Union Telegraph Co. v. Lenroot, 1945, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414. The Bozant case was discussed and approved in our decision, Mitchell v. Household Finance Corporation, supra.

Nine percent of the checks had an out-of-state destination for presentment and payment. This, of course, constitutes interstate commerce on the part of the employer. See Mabee v. White Plains Publishing Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

The handling of the checks by these employees was also a part of interstate commerce. In cashing the checks and making the deposits in the appropriate bank, these employees were forwarding goods in interstate commerce just as truly as an initiating intrastate carrier is part of the process of interstate commerce when it delivers the goods consigned to an out-of-state destination to the carrier who takes them to the place of delivery. What the employees did, in other words, was to start these checks on the first lap of an interstate journey by depositing them in a local bank. That being so, the employees are covered by the act unless excluded by the exemptions.

The next question, therefore, is whether the plaintiffs are exempt by reason either of being administrative employees or employees of a retail establishment. 29 U.S.C.A. §§ 213(a) (1), (2). Let us turn first to the administrative question and see what these employees did. The district court in its consideration of the case was not called upon to decide this question because it considered that the plaintiffs' work was not part of interstate commerce. There is no fact question presented, however. There is no dispute as to what took place. The difference of opinion concerns the effect of the acts done. Administrative employees are defined in regulations of the Secretary.[3] These employees had no one to direct in the operation of their part of the business. They were the sole employees in the several offices maintained by the employers.[4] Their primary duty was certainly not manual labor and they were paid $75.00 or more per week. They determined the identity of a person who wished to cash a check. For this purpose there were office files of signatures for many of the habitual custom-

3. "The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13(a) (1) of the act shall mean any employee:
"(a) Whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers; and
"(b) Who customarily and regularly exercises discretion and independent judgment; and
"(c) (1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in this subpart); or
"(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or
"(3) Who executes under only general supervision special assignments and tasks; and
"(d) Who does not devote more than 20 percent of his hours worked in the work-

week to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and
"(e) Who is compensated for his services on a salary or fee basis at a rate of not less than $75 [now $95] per week * * * exclusive of board, lodging, or other facilities:
"Provided, That an employee who is compensated on a salary or fee basis at a rate of not less than $100 [now $125] per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section." 29 C.F.R. § 541.200.

4. On occasional busy days part-time employees were hired to assist them.

ers. If a person was not listed in the file he was required to identify himself by some other means. At the end of the day the cashed checks were made up into a list and deposited at the appropriate bank. The employees alone determined the amount of currency needed for the day's business.

It would not be disputed that a certain amount of discretion was involved in making an estimate of the cash needs for the day and also determining the identity of the customers who wished to have their checks cashed. But such activity does not place the employees in the administrative group. Indeed, the discretion to be exercised is less than that of a top mechanic employed in an automobile service station whose judgment about diagnosing the ailment of a motor car and prescribing for its cure calls for a high degree of technical competence. The scope of the discretion here is much too narrow to place the employees in the administrative class.[5]

We turn, then, to the final question whether these plaintiffs were engaged in a retail establishment. The Government says that this question is determined by the Supreme Court decision in Mitchell v. Kentucky Finance Co., Inc., 1959, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.

2d 815. In this case it was held that the business of making small personal loans and purchasing conditional sales contracts from dealers did not constitute an exemption from the coverage of the statute following the amendment of 1949. The Supreme Court also pointed out that exemptions from this statute are to be narrowly construed.

In the present case more than 50% of the business handled by these plaintiffs was local business. They served customers in the community. They sold no goods but they did provide a service as a convenience to their customers for which the latter paid. There are affidavits that the trade considered this to be a retail enterprise.

This case is not determined by the Supreme Court decision in Mitchell v. Kentucky Finance Co. just cited. These employees are not bankers nor dealers in finance. They do not make loans; they do not extend credit. Their functions have none of the features which go along with orderly banking or financial institution enterprises except for the cashing of checks. But that cashing for their customers is a purely local, personal service for the neighborhood people who patronize them. They perform a retail service.[6] They do not fall within those

5. The district court found that supervision of these employees "was unnecessary because [their] duties were routine and followed a set pattern." See Rothman v. Publicker Industries, Inc., 3 Cir., 1953, 201 F.2d 618.

6. In this case the concept "retail" seems rather artificial since but for this statute we would find difficulty in conceiving how any question would arise whether this type of activity is "retail," "wholesale" or whatever. The Secretary's regulations provide:

"It will be observed that the sponsors of the amendment, in classifying industries on the basis of the applicability of the retail concept to their selling or servicing, did so on the basis of common knowledge as to what is recognized and what is not recognized as retail selling or servicing in the light of the objectives and purposes of the exemption as to the type of establishment it is intended to exempt. Thus, the dividing line between

sales and services to which the retail concept is applicable and those to which it is not applicable is the general and common understanding of people of what constitutes a retail sale or service in the traditional sense. * * *" 29 C.F.R. § 779.9(c).

We doubt very much whether this type of activity is or is not considered "retail" in the common understanding of the public. However, the regulations go on to describe the "characteristics" of a retail establishment.

"Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manu-

statements which exclude financial agency transactions from the exemptions of the statute.[7] The issuance of money orders and payment of utility bills are clearly within the retail service concept.

This conclusion brings us into agreement with the result reached by the district judge but for a different reason.

The judgment of the district court will be affirmed.

facturing processes." 29 C.F.R. § 779.9 (d).

In attempting to analogize to activities which clearly fall within and without the exemption, we think this check cashing service more nearly approximates a hotel or barber shop than it does a bank or

personal loan company. See 29 C.F.R. § 779.10(a), (b). It "serves the everyday needs of the community in which it is located."

7. See the administrative regulation describing the impact of the legislative history. 29 C.F.R. § 779.9(b).