**Lisa A. BURNICHE, Plaintiff,**

v.

**GENERAL ELECTRIC AUTOMATION SERVICES, INC., Defendant.**

No. 1:02–CV–1123.

United States District Court,
N.D. New York.

Feb. 12, 2004.

Lombardi, Reinhard, Walsh & Harrison, P.C. (Paul E. Davenport, Esq., of Counsel), Albany, NY, for Plaintiff.

Epstein, Becker & Green, P.C. (Barry A. Guryan, Esq., A. Jonathan Trafimow, Esq., of Counsel), New York City, for Defendant.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Lisa A. Burniche ("plaintiff") brought suit against defendant General Electric Automation Services, Inc. ("defendant"), alleging she was terminated on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) ("Title VII"), and New York Executive Law § 296(1) ("New York Human Rights Law").

Defendant filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff opposed. Oral argument was heard on December 1, 2003, in Albany, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

On October 5, 2000, in anticipation of acquiring TRS Staffing Solutions, where plaintiff then worked, defendant offered to plaintiff a pay raise and a position as a drafter. Even though plaintiff believed that the increased pay rate was inadequate, she accepted the offer "[t]o pay the bills." (Docket No. 20, p. 66.) From the outset of her employment with defendant, plaintiff sought a pay increase because of her belief that she was performing duties outside the scope of a drafter.

On February 25, 2001, defendant hired Thameem Ismail ("Ismail"). Though the parties dispute the scope of his authority, Ismail was in some respect plaintiff's supervisor. He began to investigate ways to accommodate plaintiff's request for a pay raise, and even sought to create a new position for her.

On April 20, 2001, plaintiff wrote to defendant's manager of staffing, detailing the efforts she had made to secure a pay raise. After Ismail received a copy of the correspondence, he met with his contact at General Electric Silicone ("GES"), defendant's internal client, to explore promotion possibilities for plaintiff. He left the meeting with the understanding that a promotion was possible, subject to a performance review, customer needs, and human resources approval.

In July of 2001, after nothing had yet been done, plaintiff wrote defendant's manager of human resources, commending Ismail's efforts on her behalf, and claiming that the manager of staffing was the individual blocking her efforts to secure a pay raise. The letter was referred to a regional human resources manager, who denied her request for a pay raise. He explained that she was mistaken as to the pay range for a drafter—she had confused billing rates with pay rates—and that the pay rate she was requesting was equivalent to that of a designer, for which she did not meet the qualifications.[1]

Finally, in September of 2001, defendant began the performance evaluation process for plaintiff. Ismail interviewed two of plaintiff's primary contacts at GES regarding her performance, and then spoke with his primary contact at GES. Thereafter, he typed notes of these meetings and incorporated them into a performance review form. He placed the notes and the performance review in an envelope, which he stored in his office desk drawer.

On November 7, 2001, Ismail entered his office to find plaintiff behind his desk. Defendant claims Ismail saw plaintiff leaning over an open desk drawer, that when she saw him she immediately closed the drawer and moved toward the exit, and that she had in her hand an interoffice envelope similar to the one in which he placed the notes and performance review. Plaintiff claims she was in Ismail's office trying to locate engineering drawings that needed to be filed, and that such practice was common for those under his authority. Later that day, another of defendant's employees came into Ismail's office and handed him a copy of plaintiff's performance review, which he had found on a copy machine.

That same day, Ismail told a human resources representative, Michelle Hughes ("Hughes"), of what he had observed and his own informal investigation of the incident to that point. Hughes called the human resources manager, explained the situation, and recommended that plaintiff be suspended pending an investigation.

---

1. At first glance, it would appear that the facts recited to this point may form the basis of a discriminatory failure to promote claim. Indeed, plaintiff in the complaint alleges that defendant "[f]ailed to promote or provide [plaintiff] with promotional opportunity available and provided to her male counterparts," and "[f]ailed to promote her to a higher level position, instead promot[ing][her] male counterparts." *See* Docket No. 1, ¶ 13. However, it is only her termination that plaintiff claims was in violation of federal and state law and caused her damages. *Id.* at ¶ 16. Certainly it was defendant's belief in moving for summary judgment that plaintiff was asserting only a discriminatory termination claim. *See* Docket No. 21, p. 1 ("[Defendant] terminated [plaintiff's] employment for misconduct, and not because of her sex"); *id.* at 2 ("On August 30, 2002, plaintiff commenced the instant action, alleging that [defendant] terminated her because of her sex"). Likewise, in her memorandum of law in opposition to defendant's summary judgment motion, plaintiff makes no mention of any claim other than the one for discriminatory termination, and advances arguments as to only that claim. *See* Docket No. 24. That both parties recite facts arguably more relevant to a failure to promote claim does not change this conclusion, as such facts may clearly be used as background for, and in support of, the discriminatory termination claim. *See Regional Econ, Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir.2002) ("Discriminatory intent may be inferred from the totality of the circumstances, including the historical background of the decision[,] the specific sequence of events leading up to the challenged decision[,] and contemporary statements by members of the decision making body") (internal quotations and citation omitted). In any event, it is here opined that a failure to promote claim would likely fail as a matter of law, as plaintiff has failed to allege any specific position for which she was denied promotional opportunities, or that she met the necessary qualifications for the same.

The manager concurred, and Hughes instructed Ismail to inform plaintiff of her suspension the next day when she arrived for work. As part of the subsequent investigation, the manager spoke with Ismail, and Hughes spoke with plaintiff to get her account of what had happened. Plaintiff denied taking anything from Ismail's office or even opening or closing a desk drawer. The manager eventually directed Hughes to complete the paperwork necessary for plaintiff's termination.

On November 16, 2001, Ismail informed plaintiff that she was terminated. The official termination notice stated, under the heading "Statement of the problem," "Employee in unauthorized area—Lisa was found in manager's office, behind desk with drawer open." (Docket No. 20, Ex. O.) Under the heading "Statement of company policy on this subject" appeared the language, "Employee Conduct and Work rule infractions may result in disciplinary actions, up to and including termination." *Id.*

On March 28, 2002, plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging she had been terminated on the basis of her gender. After the EEOC determined that no discrimination had occurred and issued plaintiff a right to sue letter, this lawsuit followed.

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

#### B. *Termination on the Basis of Sex*

Plaintiff claims she was fired on the basis of her sex in violation of Title VII[2] and the New York Human Rights Law ("HRL").[3] Discrimination claims under New York State law "are evaluated

---

2. *See* 42 U.S.C. § 2000e–2(a)(1) ("It shall be an unlawful employment practice for an employer to ... discharge any individual, ... because of such individual's ... sex").

3. *See* N.Y. Exec. Law § 296(1)(a) ("It shall be an unlawful discriminatory practice [f]or an employer ..., because of the ... sex ... of any individual, ... to discharge from employment such individual").

using the same analytical framework used in Title VII actions." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). That "well-known burden shifting" framework, *Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir.1999), first outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), consists of three steps. First, the plaintiff is required to demonstrate a *prima facie* case of gender discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. Second, if the plaintiff satisfies the mandates of the *prima facie* case, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's [termination.]" *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Third, if the defendant meets this obligation, the presumption of discrimination "simply drops out of the picture," *Hicks,* 509 U.S. at 510–11, 113 S.Ct. 2742, and the burden shifts back to the plaintiff to prove that the reason proffered by the defendant is a mere pretext for discrimination, *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Despite the burden shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

### 1. *Plaintiff's prima facie case*

■ To satisfy her *prima facie* case, plaintiff here must prove that: "(1) she is a woman; (2) she was qualified for her position; (3) she was discharged; and (4) her firing occurred under circumstances giving rise to an inference of discrimination." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997). The Second Circuit has "often emphasized" that the initial burden borne by a Title VII plaintiff is "minimal." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001) (internal citations omitted); *see also Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (describing burden as "not onerous"). There is no dispute that plaintiff is a female, was qualified to be a drafter at the time she was fired, and was in fact fired. Defendant contends, however, that plaintiff cannot meet the fourth prong of the *prima facie* case.

■ .Plaintiff first claims that her burden has been met because her duties were assumed by male employees after she was fired. Ordinarily, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001) (citations omitted). This principle, however, is not without its limits. For instance, where the evidence of the individual allegedly replacing the plaintiff comes from "completely unsupported self-interested assertions, the prima facie burden is not met, liberal though that standard might be." *See Elliott v. British Tourist Auth.,* 172 F.Supp.2d 395, 400 (S.D.N.Y. 2001). Here, plaintiff points to the deposition testimony of Ismail, who admitted that, after plaintiff was fired, the male employees in her former department assumed her duties. (Docket No. 22, Attorney Aff., Ex. A, p. 95.) Such is sufficient for the purposes of her minimal burden at this stage of the litigation.

Plaintiff also asserts that her *prima facie* burden has been satisfied because other male employees who engaged in the same conduct she did were not terminated. The Second Circuit recently addressed "whether a discrimination plaintiff *may* or *must* show disparate treatment" to satisfy her burden under the fourth prong of the prima facie case. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.2001) (emphasis added). Despite "conced[ing] that the case law on this particular point ... is confusing," *id.*, the court in *Abdu–Brisson* declined to issue an across-the-board ruling on the issue. To the panel's credit, it did note a particular situation where evidence of disparate treatment was *not required*—where "there are no employees similarly situated to the plaintiff." *Id.* (categorizing these types of plaintiffs as "in a class all by themselves"). "[I]n such a case, the plaintiff should be able to create an inference of discrimination by some other means." *Id.* By use of the phrase "in such a case," one could argue that the Second Circuit implicitly held that, in cases not fitting that category, evidence of disparate treatment *is required*. However, by defining the situation as one in which "there are no employees similarly situated to the plaintiff," the court essentially answered the question tautologically—i.e., if evidence of disparate treatment exists, a plaintiff should (and no doubt would) use it; if it does not, it may satisfy the fourth prong by other evidence.

■■■■■ Thus, *Abdu–Brisson* does nothing to disturb the well established principle that a plaintiff *may* satisfy the fourth prong of the prima facie case "by showing that the employer subjected [her] to disparate treatment, that is, treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000). Where a plaintiff chooses such a course of action, the evidence offered must demonstrate "that her co-employees were subject to the same performance evaluation and discipline standards," and that they were not disciplined despite "engag[ing] in comparable conduct." *Id.* at 40 (citations omitted). "Comparable" is not equivalent to "identical," but rather to conduct of "comparable seriousness," *id.* (quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817), which the court in *Graham* interpreted to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," *id.*

In support of her argument that male employees who engaged in the same conduct as her did not get terminated, plaintiff cites no affidavit or deposition other than her own. In addition, she does not name specific persons or specific dates or circumstances of such events occurring. Rather, her allegation is more general—that male employees enter Ismail's office and go behind his desk all the time without permission, and are not terminated therefor. Nevertheless, because there is evidence in the record that male employees assumed her duties after she was terminated, plaintiff has satisfied her *prima facie* burden.

### 2. Defendant's legitimate, non-discriminatory reason for termination

■■■■ As noted, because plaintiff has satisfied the burden of establishing a prima facie case of discrimination, the burden of production shifts to defendant to articulate a non-discriminatory reason for terminating her. Like plaintiff's prima facie burden, this burden "also is not a demanding one; [defendant] need only offer ... an explanation for the employment decision." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir.1999).

■■■■ In its moving papers, defendant claims plaintiff was terminated for "misconduct" that "violated [defendant's] Code

of Conduct." *See* Docket No. 21, pp. 12–13. Plaintiff points out, however, that·her termination notice stated that she was being discharged for being "in [an] unauthorized area—Lisa was found in manager's office, behind desk with drawer open." *See* Docket No. 20, Ex. O. However, the notice also states that the "subject" involved was "Employee Conduct and Work rule infractions." *Id.* Moreover, defendant in its moving papers claims that "entering the Office without permission, opening Mr. Ismail's desk drawer, and removing the Envelope containing private, confidential performance reviews of a number of employees, including plaintiff," (Docket No. 21, p. 13), *is* the conduct that violated the workplace rules. Therefore, the reason stated in the termination notice and the reason offered in the moving papers are not different in any substantive or material aspect. Using different words or language is clearly a distinction without a difference, as the reason offered in the moving papers is nothing more than a specific clarification of the termination notice.

To the extent that the reasons are indeed different, no authority has been cited or found that indicates such is impermissible.[4] In fact, it should be noted that the burden of production shifts to the defendant to "offer" a nondiscriminatory reason for the termination, not to restate specific language that had been used at the time of the event. In any event, any substantive difference between the reasons will not impact or make more difficult plaintiff's burden of proof, and plaintiff may in fact argue that such difference is evidence of defendant covering up that the real reason for the termination was discriminatory.[5]

### 3. *Pretext*

Because defendant satisfied its burden in the second *McDonnell Douglas* step, the burden shifts back to plaintiff to prove that the reason proffered by defendant is a mere pretext for discrimination. Prior to the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), in order survive summary judgment, the Second Circuit required a plaintiff to offer proof that there were factual questions as to the truth or credence of the defendant's asserted reason for taking an adverse employment action, *and* as to whether the real reason was discriminatory. *See Schnabel v. Abramson,* 232 F.3d 83, 88–89 (2d Cir.2000) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 108–09 (2d Cir.1994)); *see also Belfi v. Prendergast,* 191 F.3d 129, 140 (2d Cir.1999) (with respect to third *McDonnell Douglas* step, plaintiff must show that "not only was the reason offered false, but [also] that the real reason was discrimination"). Put another way, a plaintiff had to demonstrate "pretext plus" some other, independent evidence of discrimination.

The Supreme Court in *Reeves,* however, rejected any *per se* rule embracing the pretext plus approach.[6] Specifically, the Court noted that where a plaintiff can offer evidence that the defendant's proffered reason is false, and adduces strong

---

4. In fact, *Morris v. Charter One Bank,* 275 F.Supp.2d 249 (N.D.N.Y.2003), to which defendants direct attention, arguably stands for the proposition that it is the reason offered in litigation that is considered, even if it differs from the reason offered at the time of termination.

5. On the other side of the coin, so to speak, the court in *Morris* also indicated that any inconsistency in the reasons offered for a termination may be used by the plaintiff in carrying her ultimate burden in the third *McDonnell Douglas* step.

6. Though *Reeves* dealt with a post-trial motion, the decision "applies with equal force on a motion for summary judgment." *Schnabel,* 232 F.3d at 89.

evidence in support of a *prima facie* case, that can be (but is not always) enough to sustain the burden in the third *McDonnell Douglas* step, despite the absence of other, independent evidence of discrimination. *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Other times, however, a court can (but does not have to) require such independent evidence when, for example, "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted independent evidence that no discrimination occurred." *Id.* at 148, 120 S.Ct. 2097.

■■■ Thus, "the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel*, 232 F.3d at 90 (internal quotations and citation omitted). In other words, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). Though this would appear to eliminate any strict guidelines as to the form and substance of proof in the third *McDonnell Douglas* step in favor of a flexible, case-by-case approach, "*Reeves* in no way relaxed the requirement that plaintiffs make a showing that the defendants' proffered explanations were pretextual." *Abdu–Brisson*, 239 F.3d at 470. Also not excluded from strong consideration in the inquiry are "the strength of the plaintiff's *prima facie* case, . . . and any other evidence that supports or undermines the employer's case." *James*, 233 F.3d at 156 (internal quotations and citations omitted). Thus, though the burdens borne by a

plaintiff and a defendant in the first and second *McDonnell Douglas* steps are indeed light, it would behoove both to go above and beyond the call of duty, especially for the plaintiff when no other evidence exists aside from that offered in the *prima facie* case.

■■■ Aside from her prima facie case, which can only be characterized as weak, plaintiff has presented no compelling evidence to create a triable issue of fact with respect to the third *McDonnell Douglas* step. As noted, her "evidence" of similarly situated employees not being disciplined for the same conduct is vague, non-specific and conclusory. It is derived from no authority other than her own affidavit.

To the extent that the focus is on the investigation and termination alone, plaintiff has clearly failed to present enough evidence to survive summary judgment. Plaintiff was in Ismail's office behind his desk. He claims she left his office with an envelope similar in appearance and size to the one containing confidential performance evaluations. He was later presented with her performance evaluation, which had been found on a copy machine. He reported the incident to Hughes, who spoke with plaintiff. It is not within the purview of this court to substitute its judgment for that of those working for defendant, especially when plaintiff has failed to produce a scintilla of evidence that the investigation and facts leading to that judgment were tainted with the stain of discriminatory animus.

In fact, plaintiff arguably admits in her deposition that she was not terminated on the basis of her gender, but rather because of her persistent efforts to secure more compensation. *See* Docket No. 20, Ex. B, p. 138 (agreeing that it was her belief that the "primary reason" Ismail wanted her fired was "because [she] had been asking for a raise"). Without more—namely, evidence that her persistent efforts, *as a*

*female,* not just in general, to secure higher pay lead to her termination—plaintiff has no recourse under Title VII or the HRL.

To the extent that the focus can be widened to also include the entire history leading up to the termination, *see supra* note 1, plaintiff still has not produced enough evidence to survive summary judgment. The alleged events relating to plaintiff's efforts to secure more compensation do not give rise to a finding of discriminatory animus for her termination. Though there is evidence that she was paid below the company average, she was informed that she did not yet meet the qualifications necessary for a salary equivalent to that of a designer, and other female employees fell above the average compensation. Most importantly, there is simply *no evidence that any decision with respect to plaintiff's compensation was rooted in* discrimination. Indeed, it appears that many of defendant's employees, including Ismail, were actually trying to help plaintiff secure more compensation.

The only other evidence plaintiff points to as proof of discriminatory animus consists of conduct and statements made by Ismail. Specifically, plaintiff claims that Ismail, through his general body language and attitude, disliked her personally and avoided her at work; that Ismail failed to secure work for her; that he asked her from where should he order flowers for his wife, but refused to "talk shop" with her, (Docket No. 20, Ex. B, p. 140); that he said that he did not expect his wife to pass a driving test "because that's the way women are, they can't get it done right the first time," *id.* at 150; and his comment that "it was probably a woman thing" upon being told that plaintiff would be out of the office for an operation, *id.* at 151.

Regardless of whether Ismail was actually involved in the decision to terminate plaintiff, this conduct and these comments, without more, are insufficient grounds from which to infer discriminatory animus in her termination. The statements and conduct largely reflect that plaintiff and Ismail simply did not get along well.[7] The two comments are isolated, and can hardly form the basis for an inference that plaintiff's eventual termination, which decision incidentally was, in fact, not even made by Ismail, was the product of discrimination. Plaintiff has therefore failed to create a triable issue of fact regarding whether defendant's proffered explanation for terminating her was pretext for gender discrimination, and has failed to otherwise produce evidence creating a triable issue of fact as to discriminatory animus.

## IV. CONCLUSION

Though plaintiff is able to satisfy her prima facie burden of establishing gender discrimination, she has failed to create a genuine issue of material fact as to whether she was terminated on the basis of her sex.

Accordingly, it is

ORDERED that

1.   Defendant General Electric Automation Services, Inc.'s motion for summary judgment is GRANTED; and

2.   The complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

7.   Despite the alleged differences between them, Ismail did go to some lengths to obtain a pay raise for plaintiff by promotion or by creating a position for her. Plaintiff even went so far as to compliment him in writing for such efforts. *Supra.*